907 P.2d 506

**HYATT REGENCY PHOENIX HOTEL COMPANY, a limited partnership (aka HRP Hotel Company); and Nametco Corporation, Barry Shapiro, Lawrence J. Shapiro, Michael S. Haskes, Ben Klimist and Northern Trust Company of Arizona, Personal Representative of these Estates of Sam Shapiro, Deceased, and National Metals Company, an Arizona corporation, Plaintiffs–Appellees, Cross Appellants,**

v.

**WINSTON & STRAWN, a law partnership, Defendants–Appellants, Cross Appellees.**

**No. 1 CA–CV 92–0133.**

Court of Appeals of Arizona,
Division 1, Department D.

March 7, 1995.

Petitions for Review and
Cross–Petition for Review Denied
Dec. 19, 1995.*

Reconsideration Denied May 25, 1995.

---

*Martone, J., of the Supreme Court, voted to grant the Winston & Strawn's Petition for Review on issues A(1) and A(4).

Corcoran, J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

Bonn, Luscher, Padden & Wilkins, Chartered by John H. Cassidy, D. Michael Hall, Randall D. Wilkins, Paul V. Bonn and Robert A. Jensen, Phoenix, for plaintiffs-appellees, cross appellants.

Slutes, Sakrison, Even, Grant & Pelander, P.C. by Thomas Slutes, Tucson, and Johnston, Maynard, Grant & Parker by Logan T. Johnston III, Jeffrey C. Brodin, Phoenix, for defendants-appellants, cross appellees.

## OPINION

GRANT, Judge.

This appeal and cross-appeal arise from plaintiffs' (collectively "HRP") suit against defendant Winston & Strawn for the legal malpractice of its former partner, Arthur Greenfield. We affirm the judgment for compensatory and punitive damages against Winston & Strawn but reverse part of the trial court's award of credit for partial satisfaction against the judgment.

## I. *FACTUAL AND PROCEDURAL HISTORY*

█ We view the facts and all inferences in the light most favorable to sustaining the jury verdict and resulting judgment. *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 414, 758 P.2d 1313, 1316 (1988); *Rhue v. Dawson*, 173 Ariz. 220, 223, 841 P.2d 215, 218 (App.1992).

### A. Construction of the Phoenix Hyatt Regency Hotel

HRP was a limited partnership formed to develop the Hyatt Regency Hotel in Phoenix. Its general partners were Samuel Shapiro; his son, Barry Shapiro; two other members of the Shapiro family; two other individuals; and Nametco Corporation, a Shapiro family business.

In December 1973, HRP hired Chanen Construction Company ("Chanen") to serve as the general contractor for the hotel. The contract between HRP and Chanen was an American Institute of Architects Standard Form of Agreement ("the AIA contract"). Chanen was to be paid the cost of the work plus a fee.

The AIA contract protected HRP in several ways. For instance, the agreement did not create any contractual relations between HRP and any subcontractor. Chanen had to indemnify HRP for certain claims arising out of an act or omission of Chanen. Chanen assumed responsibility for the acts of its employees. HRP was not required to pay any money, except as required by law to a subcontractor. Even though the contract was a cost-plus contract, HRP was not required to pay for costs incurred due to Chanen's negligence.

In July 1974, Chanen entered into an Equipment Lease with Form–Eze Systems, Inc. ("Form–Eze"), pursuant to which Form–Eze furnished metal forms and other materials used to build concrete floors in the hotel. Chanen and Form–Eze also entered into a Labor Guarantee Agreement, under which Form–Eze guaranteed that labor costs for the forming operations would not exceed sixty-five cents per square foot. Form–Eze provided a supervisor with expertise in forming operations, and Chanen supplied the laborers. Form–Eze's equipment on the jobsite secured the Labor Guarantee Agreement. Chanen did not enter into these agreements as an agent for HRP.

By November 1974, the forming operations fell significantly behind schedule and a dispute arose between Chanen and Form–Eze. Form–Eze claimed that Chanen had breached the Labor Guarantee Agreement by throwing the Form–Eze supervisor off the job. Chanen countered that Form–Eze had breached the Labor Guarantee Agreement and told Form–Eze that Chanen would retain possession of the leased equipment because the labor costs exceeded the guaranteed maximum by more than $200,000. Chanen continued to use Form–Eze's equipment until the hotel's frame and flooring were completed in July 1975. Chanen then delivered the equipment to a storage yard.

## B. The Form–Eze Litigation

In July 1975, Form–Eze sued Chanen, HRP and its general partners in Federal District Court for breach of the Equipment Lease and the Labor Guarantee Agreement, and for wrongful retention of Form–Eze's equipment. Inryco, Inc. later intervened, claiming rights to the equipment by virtue of a sale and lease-back agreement it had entered with Form–Eze. Form–Eze and Inryco alleged that Chanen was acting as HRP's appointed agent.

Form–Eze asked Chanen's attorney, Arthur Greenfield, who was then a partner at Snell & Wilmer, to accept service on HRP's behalf. Greenfield asked HRP's Barry Shapiro if HRP would like Greenfield to represent HRP in the matter and accept service on HRP's behalf; Shapiro said yes. Although Greenfield immediately recognized a potential conflict of interest, he never met jointly with Chanen and HRP to discuss the conflict, and he never obtained a waiver of the conflict from Chanen and HRP. Greenfield also never informed HRP that he served on Chanen's board of directors.

■ Greenfield answered the Form–Eze and Inryco complaints on behalf of Chanen and HRP, erroneously admitting that Chanen was acting as an agent for its disclosed principal, HRP.[1] Greenfield's defense theory was that neither defendant had breached the Equipment Lease, and that Form–Eze, not Chanen or HRP, had breached the Labor Guarantee Agreement. Chanen and HRP counterclaimed against Form–Eze for $211,528.57 in cost-overruns. Greenfield asserted that, pursuant to the Labor Guarantee Agreement, Chanen and HRP were entitled to continued possession of Form–Eze's

1. Neither Form–Eze nor Inryco had alleged that Chanen was an agent for a disclosed principal. Under Arizona law, the agent of a fully disclosed principal is not liable in contract for the principal's breach. *Ferrarell v. Robinson*, 11 Ariz.App. 473, 475, 465 P.2d 610, 612 (1970). However, the agent for an undisclosed principal may be held liable for the principal's breach of contract. *See generally* Restatement (Second) of Agency § 322 (1958).

equipment as security for the cost-overruns. Greenfield testified that he could ethically represent Chanen and HRP because of unitary interest created by the cost-plus contract with Chanen in that any recovery from Form–Eze would inure to HRP, but any liability to Form–Eze would be borne by HRP. However, Greenfield never explained to HRP its rights under the AIA contract and the claims and defenses HRP was foregoing by virtue of the joint representation with Chanen.

Early in the case, Form–Eze's counsel, Eric Bistrow, discussed with Greenfield how Chanen was Form–Eze's "principal target." Bistrow suggested that because Greenfield's defense theory shifted any potential liability from Chanen to HRP, Greenfield might have a conflict in representing both defendants. Greenfield acknowledged the possibility of a conflict, but later told Bistrow that he had resolved it.

In April 1977, HRP filed for bankruptcy. Greenfield twice wrote to Barry Shapiro and suggested that in light of the pending bankruptcy, HRP should consider retaining separate counsel in the Form–Eze litigation. Greenfield advised Shapiro, however, that he did "not believe there is any conflict in our representation of Chanen along with [HRP] as we have been doing." HRP did not retain separate counsel.

In the Spring of 1978, HRP assigned its expected recovery on the counterclaim to Arizona Title Insurance & Trust Company, the insurer of HRP's defaulted construction loans on the hotel. Arizona Title agreed to advance HRP's attorneys' fees [2] to Greenfield's new law firm, Craig, Greenfield & Irwin ("CG & I").[3] HRP remained liable for any judgment against it arising out of the litigation. Greenfield was aware that even

though Arizona Title was paying his fees, he owed a duty to his client, HRP.

On September 6, 1979, Greenfield sent HRP notice that a trial before a Special Master appointed by the District Court was scheduled for later that year.[4] Greenfield did not communicate with HRP for another two-and-one-half years. Instead, Greenfield sent status reports, bills and other correspondence concerning the case to Arizona Title.

Greenfield tried the Form–Eze case to the Special Master on March 19–27, 1980. He did not inform HRP that its case was being tried. No HRP witnesses were called, and the AIA contract between Chanen and HRP was not offered as an exhibit. Greenfield offered no evidence on behalf of HRP showing that the retention of the forms was the conduct of Chanen, not HRP. When that issue came up at trial, HRP had no witness to refute the testimony of Chanen's witness that HRP made the decision to retain the forms.

In a post-trial brief, Greenfield argued that Form–Eze could not "hold Chanen liable since it was acting in an agency capacity for a disclosed principal [HRP]."[5] In response, Form–Eze reiterated its position that Chanen was primarily liable: "In the event [the court] deems that an election be made as to whether Chanen or the other defendants are liable, it is clear that Chanen is the culpable party under the agreements.... Plaintiff always looked to Chanen because it clearly believed that its contracts were with Chanen."

On December 8, 1980, the Special Master stated his preliminary conclusion that Chanen and HRP were liable because they had breached the Labor Guarantee Agreement. He directed the parties to supply additional briefing. On February 23, 1981, Form–Eze

---

**2.** HRP eventually repaid Arizona Title all the attorneys' fees plus interest, a total of over $100,000.

**3.** On July 1, 1978, Greenfield left Snell & Wilmer and formed CG & I.

**4.** The trial was originally set for December 1979. Although the trial date was continued twice, Greenfield did not inform HRP of the new dates.

**5.** Likewise, in an earlier motion for summary judgment on Chanen's behalf, Greenfield had argued that because "Chanen was acting as agent for a disclosed principal, Chanen has no liability to [Form–Eze or Inryco]." Both Form–Eze and Inryco opposed the motion and the district court denied it.

requested a judgment against Chanen and HRP for $3,326,272.10, plus costs and attorneys' fees.

### ·C. Greenfield's Actions After Joining Winston & Strawn

Greenfield became a partner at Winston & Strawn on March 1, 1981, when CG & I merged with the Chicago firm. Greenfield and his Phoenix partners brought their clients and legal business to Winston & Strawn without liquidating CG & I's affairs.

On March 2, 1981, the day after he joined Winston & Strawn, Greenfield filed a brief arguing, *inter alia*, that Chanen should not be held liable because it was HRP's agent. Greenfield still had not informed HRP. that its case had been tried almost a year earlier or of HRP's potential liability.

Greenfield did, however, inform Chanen of these matters. In a letter from Greenfield to Chanen's accountants, he advised that the Special Master's tentative findings "appear to be adverse to defendants [Chanen and HRP]," but that "the issues of agency" would have to be resolved before Chanen's liability "[could] be finally computed." In a letter from Chanen to its accountants, Greenfield opined that Chanen had "a significant chance of using the agency relationship to ultimately protect Chanen."

On June 25, 1981, the Special Master held a hearing addressing the amount of damages to be awarded to Form–Eze and Inryco. Although Greenfield knew that HRP and Chanen faced potential liability of over $3 million, he sent an associate, Michael Rollins, to attend the hearing. The hearing transcript reflects that Rollins appeared on behalf of only Chanen. One of Form–Eze's attorneys later testified that Rollins "did nothing at all" at the hearing. At one point, the Special Master offered Rollins an additional five days to address a legal point. Rollins responded, "Fine, because I haven't gone through the briefs." Rollins later testified that he was referring to briefs handed out at the hearing.

On August 28, 1981, Greenfield argued to the Special Master against finding that Chanen was acting as an agent for an undisclosed principal. Greenfield knew that his argument, if successful, would have completely protected Chanen and left HRP liable for the whole judgment.

On September 22, 1981, the Special Master entered his report holding HRP and Chanen jointly and severally liable for $3.6 million. Greenfield did not inform HRP of the Special Master's findings.

In October and November 1981, Greenfield argued to the District Court, *inter alia*, that the Special Master was wrong in finding that Chanen should be held liable to Form–Eze and Inryco. In addition to his previously asserted "disclosed principal" argument, Greenfield argued that Form–Eze had elected to release Chanen, thereby leaving HRP solely liable for the judgment. Greenfield had never informed HRP that he would argue, contrary to Form–Eze's contentions, that Form–Eze had elected to hold HRP solely liable.

On February 4, 1982, Greenfield had a package hand-delivered to Barry Shapiro which informed HRP of what had transpired since Greenfield's last communication two-and-one-half years earlier. However, Greenfield's cover letter still did not tell HRP that the Special Master had recommended a $3.6 million judgment against HRP; the letter merely stated that "the short term economic consequences of the report being adopted by the Federal District Judge would be significant to the defendants and to Arizona Title Insurance Company." The letter suggested that a meeting be scheduled between HRP, Chanen, and Arizona Title "for the purpose of reviewing this matter in its current posture" "[b]ecause there are varying interests involved on behalf of all defendants." Enclosed in the package were several pleadings that Greenfield had filed without HRP's knowledge. When Barry Shapiro read the package and realized that he, his father, his brother, and his cousin each faced personal liability of $3.6 million, he "stuck [his] head in the trash bucket and threw up." After receiving the package, Shapiro was unable to reach Greenfield because Greenfield had left town prior to sending the package and was unavailable to take Shapiro's calls.

### D. The Conclusion of the Form–Eze Litigation

Aware of the conflict for the first time, HRP immediately retained new counsel to represent it before the District Court which was then reviewing the Special Master's findings. HRP's new counsel tried to correct Greenfield's errors and omissions and attempted to have the District Court re-open the evidence to admit the AIA contract. However, as later explained by the Ninth Circuit Court of Appeals, HRP's efforts came too late because the Special Master's trial proceedings had already closed.

HRP's new counsel was, however, successful in having the judgment reduced from the $3.6 million recommended by the Special Master to the $1.6 million ultimately ordered by the Ninth Circuit. HRP eventually paid $265,836.40 to Form–Eze and $546,071.87 to Inryco.

### E. Procedural History of This Legal Malpractice Action

HRP filed this action against Greenfield, CG & I, and Winston & Strawn on June 24, 1988, alleging that Greenfield had acted negligently and breached his contractual and fiduciary duties to HRP in the Form–Eze litigation. HRP later amended its complaint to seek punitive damages.

Prior to trial, Greenfield and the two malpractice insurance carriers who provided coverage prior to March 1, 1981, settled HRP's claims against Greenfield and CG & I for $1,500,000. HRP allocated $1 million of the settlement to HRP's punitive damage claim against CG & I and Greenfield.

Winston & Strawn proceeded to trial. At the close of the evidence, the court instructed the jury, over Winston & Strawn's objection, that Winston & Strawn was responsible for any acts of Greenfield or CG & I which occurred after July 1, 1978. The court also instructed the jury, again over Winston & Strawn's objection, that it could award punitive damages only for Greenfield's conduct after March 1, 1981, the date he joined Winston & Strawn. The jury found for HRP and awarded $1,238,568 in compensatory dam-

ages and $3,000,000 in punitive damages against Winston & Strawn.

The trial court awarded $667,055.01 in prejudgment interest on HRP's compensatory damages and entered its judgment on September 4, 1991. Winston & Strawn filed a Motion For A New Trial Or, In The Alternative, To Alter Or Amend Judgment on September 19, 1991. The trial court denied Winston & Strawn's Motion but ruled that the pre-trial settlement payments, although not a proper subject of Winston & Strawn's Motion, should operate as a partial satisfaction of HRP's judgment against Winston & Strawn.

Winston & Strawn filed a timely Notice of Appeal and HRP timely cross-appealed. We have jurisdiction pursuant to Ariz.Rev.Stat. Ann. ("A.R.S.") section 12–2101(B), (C), (E) and (F)(1) (1994).

## II. ISSUES AND CROSS–ISSUES

A. Should the punitive damage award against Winston & Strawn be reversed or reduced?

1. Can Winston & Strawn be liable in punitive damages for the conduct of its partner Greenfield under a theory of respondeat superior?

2. Did Winston & Strawn proximately cause HRP's compensatory damages after March 1, 1981?

3. Was there clear and convincing evidence of Greenfield's evil mind?

4. Did the trial court's post-trial review of the punitive damage award satisfy due process standards?

5. Did the trial court abuse its discretion in denying Winston & Strawn a remittitur?

B. Did the trial court err in ruling that, as a matter of law, Winston & Strawn assumed CG & I's contingent tort liability?

C. Did the trial court improperly instruct the jury on the applicable negligence standard?

D. Was HRP entitled to prejudgment interest?

E. Did the trial court err in crediting, as partial satisfaction of the jury's award

against Winston & Strawn, settlement payments received by HRP prior to trial from CG & I and Greenfield?

## III. DISCUSSION

### A. Punitive Damages

#### 1. Vicarious liability

■ The trial court recognized that "the award of punitive damages ... against Winston & Strawn was based solely upon a theory of respondeat superior. There was no claim that Winston & Strawn acted negligently or punitively other than through the actions of Greenfield." Winston & Strawn argues that under Arizona law, a wholly passive employer cannot be liable for punitive damages under the respondeat superior doctrine. We disagree and hold that Arizona's partnership statutes and common law permit punitive damages to be awarded vicariously against Winston & Strawn for acts that Greenfield performed in the ordinary course of the partnership's business.

Arizona's legislature has adopted the Uniform Partnership Act which provides in part:

Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership ... loss or injury is caused to any person, not being a partner in the partnership, or *any penalty is incurred*, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

A.R.S. § 29–213 (1989) ("UPA section 13") (emphasis added). Winston & Strawn contends that this section provides vicarious liability only for compensatory damages, and that it is silent on the issue of punitive damages. This contention overlooks the statute's

explicit imposition of vicarious liability for "any penalty." Although Arizona's courts have never squarely addressed whether UPA section 13's reference to "any penalty" includes punitive damages, this court has interpreted the statute to impose vicarious liability on partners for damages that are punitive in nature. *Ayres v. Red Cloud Mills, Ltd.*, 167 Ariz. 474, 476 n. 2, 808 P.2d 1226, 1228 n. 2 (App.1990) (affirming award of treble damages for unpaid wages against limited partnership and its general partner). Moreover, interpreting UPA section 13 to impose vicarious punitive damages liability on partners is consistent with the general law of partnership as noted by authoritative commentators and the *Restatement.*[6] Contrary to Winston & Strawn's contentions, UPA section 13's "any penalty" language contemplates the imposition of vicarious liability for punitive damages on partners.

Winston & Strawn next argues that UPA section 13's "any penalty" language is too ambiguous, and therefore UPA section 13 has not supplanted Arizona's common law on the vicarious imposition of punitive damages. *Wyatt v. Wehmueller*, 167 Ariz. 281, 284, 806 P.2d 870, 873 (1991) ("If the legislature fails to clearly and plainly manifest an intent to alter the common law, the common law remains in effect."). Winston & Strawn notes that other jurisdictions that have referred to UPA section 13 in upholding a partnership's vicarious liability for punitive damages have done so because UPA section 13 is consistent with their common law.[7] In other states where the common law has rejected vicarious liability for punitive damages, courts have not held partnerships vicariously liable de-

---

6. *See Bromberg & Ribstein On Partnership* § 4.07 (1991) ("Punitive damages have been held recoverable against the partnership, as long as the act was committed in the ordinary course of the partnership business. This is consistent with the provision in U.P.A. § 13 for partnership liability for 'any penalty' to the same extent as the acting partner and with corporate liability for punitive damages."); Scott Rowley, *1 Rowley On Partnership* § 13.1, at 373 (2nd ed. 1960); Restatement (Second) of Agency, ch. 7, Scope Note at 454 (1958) ("[For the purpose of imposing punitive damages], the conduct of any member of a partnership ... can be treated as the conduct of a principal.").

7. *See Meleski v. Pinero Int'l Restaurant, Inc.*, 47 Md.App. 526, 424 A.2d 784, 794 (1981) (holding that a jury instruction based on UPA § 13 was proper because Maryland's common law allowed vicarious punitive liability against partners); *Rogers v. Hickerson*, 716 S.W.2d 439, 447 (1986). *But see Mulle v. Scheiler*, 484 So.2d 47, 48 (Fla. Dist.Ct.App.1986) (citing Florida's version of UPA § 13 to uphold punitive damage award against entire partnership where two partners actively participated in fraud and misrepresentation; no discussion of common law rule).

spite that state's adoption of UPA section 13.[8]

Winston & Strawn's argument in this respect is inconsequential because there is no conflict between UPA section 13 and Arizona's common law. Arizona's courts have long held that a business may be vicariously liable in punitive damages for acts an employee commits in furtherance of the business and within the scope of employment. *Western Coach Corp. v. Vaughn,* 9 Ariz.App. 336, 338, 452 P.2d 117, 119 (1969) (citing *Southern Pac. Co. v. Boyce,* 26 Ariz. 162, 223 P. 116 (1924)).

Winston & Strawn asserts that recent appellate decisions have eroded the *Vaughn/Boyce* rule allowing respondeat superior liability for punitive damages, and that Arizona has now adopted the Restatement rule which requires a showing of some fault by the employer or that the employee served in a managerial capacity.[9] *See Wiper v. Downtown Dev. Corp.,* 152 Ariz. 309, 732 P.2d 200 (1987); *Jacobson v. Superior Court,* 154 Ariz. 430, 743 P.2d 410 (App.1987); *White v. Mitchell,* 157 Ariz. 523, 759 P.2d 1327 (App. 1988); *Walter v. Simmons,* 169 Ariz. 229, 818 P.2d 214 (App.1991); *Wyatt,* 167 Ariz. at 281, 806 P.2d at 870. Winston & Strawn has misread these cases.

On this point the dissent raises the "issue" of whether Greenfield was a "managerial agent" of Winston & Strawn and then admits that the issue was not litigated in the trial court and would only become relevant if Arizona adopted Restatement of Torts (Second), section 909, which it has not. In its opening statement, Winston & Strawn proclaimed:

> And I'll make the deal with you right now if you think he [Greenfield] lacks integrity and tried to prefer one client over the other and did so and hurt HRP and Shapi-

ro, find against him. Find against Winston & Strawn.

The position taken by Winston & Strawn at trial and the position taken by it on appeal and apparently accepted by the dissent are irreconcilable. The "managerial agent" issue does not comport with Arizona law and the trial court instructed the jury that Winston & Strawn was responsible as a matter of law for any acts committed by CG & I after July 1978.

In *Wiper,* the Arizona Supreme Court accepted review "to clarify the relationship between punitive damages and the doctrine of respondeat superior." 152 Ariz. at 310, 732 P.2d at 201. The court reaffirmed the *Vaughn/Boyce* rule: "Arizona has specifically rejected the Restatement view in favor of a rule allowing punitive damages against an employer for acts of its employees 'so long as committed in the furtherance of the employer's business and acting within the scope of employment.'" *Id.* (quoting, *Vaughn,* 9 Ariz. App. at 338–39, 452 P.2d at 119–20). *Wiper* held that "an award of punitive damages against an employer is improper where no punitive damages have been awarded against the employee and the employer's liability is based solely upon the doctrine of respondeat superior [instead of on the employer's own wrongful conduct]." *Id.* at 312, 732 P.2d at 203. In other words, where no defendant's actions merit punitive damages, none should be assessed. Accordingly, the court reversed a punitive damages award against an employer where the jury did not find that the employee's conduct warranted punitive damages. *Id.* Contrary to Winston & Strawn's reading, *Wiper* does not prohibit punitive damages against an employer when, as in the

---

8. *See In re WPMK Corp.,* 59 B.R. 991 (Bankr. D.Haw.1986); *Husted v. McCloud,* 450 N.E.2d 491 (Ind.1983).

9. Restatement (Second) of Torts § 909 (1979) provides:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
> (a) the principal or a managerial agent authorized the doing and the manner of the act, or

> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> (d) the principal or a managerial agent of the principal ratified or approved the act.

*See also* Restatement (Second) of Agency § 217 C (1957).

present case, a jury concludes that the employee's acts warranted punitive liability.

Nor do the three decisions of this court that Winston & Strawn cites change Arizona's law. *Jacobson* was not a scope and course of employment case, but rather involved the family purpose doctrine which imputes liability for a child's negligent operation of a vehicle to the child's parents. In holding that a negligent driver's parents could not be punitively liable, we distinguished the family purpose doctrine from the respondeat superior doctrine. We reasoned that vicarious punitive liability is justified under respondeat superior because "an employer receives some economic benefit from the employee's labor and specifically defines for the employee the scope of employment." 154 Ariz. at 432, 743 P.2d at 412. We noted in dicta that our supreme court might adopt the *Restatement* view in the future, but that respondeat superior remained Arizona's law. *Id.*

In *White v. Mitchell* the jury was instructed that to be liable in punitive damages, the employer must have "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." 157 Ariz. at 527, 759 P.2d at 1331. We reversed the jury's punitive damages award against the employer because there was not sufficient evidence to support this theory of liability. *Id.* at 529, 759 P.2d at 1333. The employer's potential liability under a theory of respondeat superior was not an issue in the case, and the decision did not cite the Restatement's sections regarding vicarious liability. Likewise, in *Walter v. Simmons* we did not reach the issue of a principal's vicarious liability for its agent's conduct because

there was insufficient evidence to support a punitive damages award against the agent. 169 Ariz. at 240, 818 P.2d at 225.

Nor does the supreme court's decision in *Wyatt* mean that Arizona has rejected the *Vaughn/Boyce* rule and adopted the Restatement view. *Wyatt* held that clients whose attorney filed a groundless *lis pendens* notice could not be held liable for statutorily authorized damages that were punitive in nature where the clients had no knowledge and did not consent to the attorney's action. 167 Ariz. at 287, 806 P.2d at 876. Although some of *Wyatt's* language suggests a shift to the Restatement view,[10] *Wyatt* confirms that the common law allows punitive liability against a principal for the conduct of its agent without any showing of the principal's evil mind. The court declined to apply common law agency principles to allow recovery from unknowing clients because the applicable statute, A.R.S. section 33–420(A) (providing a penalty for filing a groundless *lis pendens*), abrogates Arizona's common law. 167 Ariz. at 286, 806 P.2d at 875. The court reasoned that unlike the common law, the statute requires scienter on the part of the client before the client can be punished for the attorney's acts. *Id.* at 286–87, 806 P.2d at 875–76.

To summarize, under Arizona's version of UPA section 13 and our common law doctrine of respondeat superior, Winston & Strawn can be vicariously liable in punitive damages for acts that its partner Greenfield performed in the ordinary course of the partnership's business. Arizona has not adopted the Restatement view requiring some employer participation or acquiescence in the employee's acts or that the employee was a manager of the employer.[11] This court re-

10. "Agency principles restrict recovery to actual damages unless some participation, or at least acquiescence, is shown on the part of the principal." 167 Ariz. at 286, 806 P.2d at 875 (citing the Restatement (Second) of Agency) § 217(C) (1958)).

11. Even if Arizona followed the Restatement view, Winston & Strawn could still be liable in punitive damages because it employed Greenfield in a managerial capacity and he managed HRP's case. Arizona defines a "managing agent," *inter alia*, as a person who is invested with general powers to exercise judgment and discretion in dealing with a firm's matters. *Slow Dev. Co. v.*

*Coulter,* 88 Ariz. 122, 127, 353 P.2d 890, 893 (1960) (hotel manager was a managing agent). In the context of HRP's relationship with Winston & Strawn, Greenfield's actions *were* the actions of the firm. *See Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 906 F.2d 1206, 1222–23 n. 19 (8th Cir.1990) (investment firm was vicariously liable in punitive damages for brokers' conduct because brokers' held positions of trust and were responsible for managing clients' money); *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 771–72 (9th Cir.1984) (broker in securities partnership acted in a managerial

cently upheld a punitive damage award against an employer who claimed it was unaware of its employee's acts. *Hooper v. Truly Nolen of America, Inc.,* 171 Ariz. 692, 832 P.2d 709 (1992). We said that a "[p]laintiff may prove entitlement to punitive damages via a number of factors, no single one of which is exclusive. The primary consideration is the reprehensibility of conduct and severity of harm." 171 Ariz. at 694, 832 P.2d at 711. Even the dissent agrees that Greenfield's conduct was reprehensible and that the harm to HRP was severe.

### 2. Did Winston & Strawn proximately cause HRP's compensatory damages after March 1, 1981?

▮ A plaintiff must be entitled to compensatory damages before being entitled to punitive damages. *Wyatt,* 167 Ariz. at 285, 806 P.2d at 874. To recover compensatory damages in a legal malpractice action the plaintiff must prove that but for the attorney's negligence, the prosecution or defense of the original action would have been successful. *Asphalt Engineers, Inc. v. Galusha,* 160 Ariz. 134, 136–37, 770 P.2d 1180, 1182–83 (App.1989). If there is any evidence which would permit reasonable jurors to make such a finding, proximate causation is a jury question. *Tennen v. Lane,* 149 Ariz. 94, 97, 716 P.2d 1031, 1034 (App.1985). The jury views the first suit—"the case within the case"—from the standpoint of what a reasonable judge or jury would have decided but for the attorney's negligence. *Molever v. Roush,* 152 Ariz. 367, 375, 732 P.2d 1105, 1113 (App. 1986); *Phillips v. Clancy,* 152 Ariz. 415, 418, 733 P.2d 300, 303 (App.1986).

▮ Winston & Strawn contends there is no evidence that HRP sustained compensatory damages due to Greenfield's conduct after he joined the firm on March 1, 1981. By then, Winston & Strawn argues, HRP had already sustained all its damages stemming from the Form–Eze litigation because the Special Master announced on December 8, 1980, his preliminary findings that HRP and Chanen were jointly and severally liable. Winston & Strawn argues there was nothing it could have done after March 1, 1981, to

capacity where he had complete authority to act

relieve HRP of liability to Form–Eze and Inryco.

Viewing the record in the light most favorable to upholding the jury's verdict, we conclude there is substantial evidence that Winston & Strawn proximately caused HRP to sustain actual damages in the Form–Eze litigation. The evidence included the AIA contract which arguably could have provided HRP with valid defenses against Form–Eze and Inryco and cross-claims against Chanen. According to Greenfield, the Special Master's findings of December 8, 1980, were only tentative and "preliminary." The Special Master requested additional briefing, and the parties still had an opportunity to change the outcome of the case. Winston & Strawn, through Greenfield, represented HRP for more than six months *before* the Special Master entered his final report. An expert witness for HRP testified that during this period, Greenfield's conflict should have been disclosed and Winston & Strawn should have moved the Special Master to re-open the evidence to allow HRP to advance its defenses and cross-claims under the AIA contract. Instead, Winston & Strawn, through Greenfield, persisted in arguing that Chanen should not be held liable because Chanen was the disclosed agent of HRP. Thus, the jury could have reasonably concluded that but for Winston & Strawn's legal malpractice from March 1 to September 22, 1981, HRP could have significantly reduced its liability in the Form–Eze litigation.

▮ Another source of HRP's compensatory damages is the attorneys' fees it paid in the Form–Eze litigation. Unaware of Greenfield's fundamental conflict of interest, HRP paid Winston & Strawn's fees through advances from Arizona Title. After learning of the conflict, HRP hired independent counsel in an attempt to correct Greenfield's errors and omissions. The jury properly awarded these amounts as part of HRP's actual damages, and these damages satisfy the predicate requirement for an award of punitive damages. *See Asphalt Engineers,* 160 Ariz. at 137, 770 P.2d at 1183 (fees paid to negligent attorney and a second attorney who

in all client matters).

performed work that negligent attorney had failed to perform were part of legal malpractice plaintiff's actual damages).

The dissent argues that the damage to HRP was done before March 1, 1981. After the Special Master had ruled on liability, Greenfield still had a conflict of interest. While Greenfield probably wanted to keep damages as low as possible for the favored client—Chanen, HRP continued to be injured by Greenfield and Winston & Strawn. HRP, through Arizona Title, was still paying legal fees to Winston & Strawn for Greenfield's non-representation—fees that HRP would undoubtedly have refused to pay had they then known of Greenfield's duality. Indeed these legal fees were a recognized part of HRP's compensatory damages. Furthermore, had Greenfield made HRP aware of the situation, HRP could have retained another firm to attempt to change the ruling of the Special Master as to HRP based on Greenfield's failure to provide HRP with a legitimate defense.

Contrary to the dissent's position, there was ample justification for vicarious liability after March 1, 1981, as to Winston & Strawn. After all, Greenfield brought, as part of his book of business, two major clients to Winston & Strawn—HRP and Chanen. Winston & Strawn benefited accordingly by collecting substantial legal fees from both.

### 3. Was there sufficient evidence of Greenfield's evil mind?

■ To recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant engaged in aggravated and outrageous conduct with an "evil mind." *Thompson v. Better–Bilt Aluminum Prod. Co.*, 171 Ariz. 550, 556–57, 832 P.2d 203, 209–10 (1992); *Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986); *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 331–32, 723 P.2d 675, 680–81 (1986). A defendant acts with the requisite evil mind when he intends to injure or defraud, or deliberately interferes with the rights of others, "consciously disregarding the unjustifiable substantial risk of significant harm to them." *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680; *Gurule v. Illinois Mut.*

*Life & Cas. Co.*, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987). Important factors to consider when deciding whether a defendant acted with an evil mind include (1) the reprehensibility of defendant's conduct and the severity of the harm likely to result, (2) any harm that has occurred, (3) the duration of the misconduct, (4) the defendant's awareness of the harm or risk of harm, and (5) any concealment of it. *Thompson*, 171 Ariz. at 556, 832 P.2d at 209. The plaintiff may meet the clear and convincing standard by either direct or circumstantial evidence which persuades the jury of the high probability of the defendant's evil mind. *Id.* at 557, 832 P.2d at 210. This court must affirm a jury's award of punitive damages if any reasonable view of the evidence would satisfy the clear and convincing standard. *Id.* at 557–58, 832 P.2d at 210–11; *Rhue v. Dawson*, 173 Ariz. at 232, 841 P.2d at 227.

■ Winston & Strawn attacks the jury's $3 million punitive damages award by arguing that there was no substantial evidence of malpractice by Greenfield, let alone "evil mind." Under Winston & Strawn's view of the evidence, Greenfield vigorously asserted HRP's "best defense" that HRP was not liable because Form–Eze had breached its contract. That the Special Master disagreed with Greenfield's theory is not evidence of legal malpractice or of Greenfield's "evil mind." Winston & Strawn further argues that Greenfield fully revealed his "disclosed agent" strategy to HRP's Barry Shapiro at the beginning and throughout the lawsuit, and that Shapiro did not object. Winston & Strawn claims that Greenfield raised the issue of whether HRP should have separate counsel on several occasions. Lastly, Winston & Strawn contends that Greenfield had no motive to harm HRP because he socialized with the Shapiro family and had previously done legal work for them.

Winston & Strawn's argument overlooks several important facts which the jury did not overlook. There is clear and convincing evidence that in representing both HRP and Chanen, Greenfield consciously disregarded HRP's rights under the AIA contract and exposed HRP's partners to unjustifiable risks of personal liability. Greenfield never

explained to HRP how the AIA contract provided potential defenses to Form–Eze's claims and rights of indemnification from Chanen. Instead, when he answered Form–Eze's complaint, Greenfield erroneously admitted a fact that Form–Eze had not alleged, namely, that Chanen was HRP's disclosed agent. Greenfield knew this admission could shift any potential liability for Chanen's breach of contract to HRP. Contrary to Form–Eze's theory that Chanen was primarily liable, Greenfield persistently argued that any liability should fall on HRP, not Chanen. By June 1981, Greenfield knew from the Special Master's preliminary findings and Form–Eze's proposed judgment that Chanen and HRP faced a serious risk of a $3.6 million liability. Yet Greenfield sent an admittedly inexperienced and possibly unprepared associate to the post-trial damages hearing. This indifference to exposure is consistent with Greenfield's opinion to Chanen's auditors that he had "a significant chance of using the agency relationship to ultimately protect Chanen," i.e., that Greenfield could shift all liability to his other client, HRP.

There is also clear and convincing evidence that Greenfield had a motive to sacrifice HRP in order to protect Chanen. HRP filed for bankruptcy at approximately the same time that Greenfield assured Form–Eze's counsel that he had resolved any conflict arising from the joint representation of HRP and Chanen. HRP was struggling to pay its legal bills and had lost its only significant asset, the hotel, in a foreclosure sale. Greenfield recommended that HRP retain separate counsel not because of the conflict in the joint representation, but because of HRP's bankruptcy. In contrast to HRP, Chanen was the third or fourth largest construction company in Arizona and generated $48,000 in legal fees for Greenfield's firm during 1980. Greenfield was on Chanen's board of directors. In addition, there is clear and convincing evidence that Greenfield actively concealed his efforts throughout the Form–Eze litigation. From the outset, Greenfield was aware of the conflict between HRP and Chanen; but he never disclosed the conflict to HRP and never obtained a waiver. Greenfield did not communicate with HRP

from September 1979 to February 1982. Greenfield waited five months after the Special Master's decision to inform HRP's partners that they were liable for a $3.6 million judgment. Even then, Greenfield had a messenger deliver this devastating news while he left town.

Based upon this evidence, the jury's finding that Greenfield acted with an evil mind is reasonably supported. *See Elliott v. Videan,* 164 Ariz. 113, 791 P.2d 639 (App.1989) (punitive damages were appropriate where attorney had conflict of interest, concealed it from his client, and acted to benefit other clients at first client's expense); *Asphalt Engineers,* 160 Ariz. at 137, 770 P.2d at 1183 (affirming award of punitive damages against attorney who breached ethical duties to his client and concealed his misconduct).

### 4. *Post-trial review of the punitive damage award under Due Process standards.*

"A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." *Honda Motor Co. v. Oberg,* — U.S. —, —, 114 S.Ct. 2331, 2342, 129 L.Ed.2d 336 (1994). Due process requires reasonable constraints on a jury's discretion to impose punitive damages, including post-verdict judicial review to ensure that the award is not excessive. *Id.* at —, 114 S.Ct. at 2341; *see also Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 20, 111 S.Ct. 1032, 1044, 113 L.Ed.2d 1 (1991). Winston & Strawn complains that the punitive damages award violates due process because the trial court did not conduct a full post-trial review applying all the criteria discussed in *Haslip.*

In *Haslip,* the Supreme Court held that Alabama's method for awarding and reviewing punitive damages "imposes a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders." 499 U.S. at 22, 111 S.Ct. at 1045. In Alabama, the trial court instructs jurors that punitive damages are meant to punish and deter, and to consider the character and the degree of the wrongful conduct. *Id.* at 19, 111 S.Ct. at

1043. After the verdict, the trial court must state on the record its reasons for upholding or reducing the jury's award. *Id.* at 25, 111 S.Ct. at 1047. Then Alabama's appellate courts ensure that the punitive award is reasonable by considering several factors:

> (a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

*Id.* at 21–22, 111 S.Ct. at 1045.

Contrary to Winston & Strawn's assertions, *Haslip* does not require that every state's trial and appellate courts conduct a detailed review of punitive damage awards identical to Alabama's review. *Haslip* declined to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* at 18, 111 S.Ct. at 1043. Rather, "[a]s long as the discretion [to award punitive damages] is exercised within reasonable constraints, due process is satisfied." *Id.* at 20, 111 S.Ct. at 1044.

■ Arizona's method for imposing punitive damages provides several procedural protections to assure that an award of punitive damages is justified and reasonable. *Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 504, 733 P.2d 1073, 1087, *cert. denied,* 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177

(1987). The plaintiff must survive a motion for a directed verdict, the jury must exercise its discretion to award punitive damages, the verdict is subject to post-trial motions and review by the trial judge, and the judgment is subject to appeal. *Id.* Then this court examines allegedly excessive punitive damage awards applying criteria very similar to those applied in *Haslip:* (1) the proportionality of the award to the wrongdoer's financial position to ensure that the goals of punishment and deterrence are served without financially devastating the defendant; (2) the reprehensibility of the defendant's conduct, including the duration of the misconduct, the defendant's awareness of the risk of harm, and any concealment; and (3) the profitability to the defendant of the wrongful conduct. *Hawkins,* 152 Ariz. at 497–502, 733 P.2d at 1080–85. These procedural protections have a real effect in practice; Arizona's courts do not hesitate to overturn excessive or inadequate punitive damage awards. *See Carter-Glogau Lab. Inc. v. Construction Laborers' Local 383,* 153 Ariz. 351, 358, 736 P.2d 1163, 1170 (App.1987) (holding that trial court properly remitted jury's punitive damage award from $600,000 to $200,000); *Maxwell v. Aetna Life Ins. Co.,* 143 Ariz. 205, 218–19, 693 P.2d 348, 361–62 (App.1984) (remanding for new trial where jury passion and prejudice produced inadequate $1 punitive damage award).

Winston & Strawn has received full due pocess on the question of punitive damages. The trial court's Recommended Arizona Jury Instruction ("RAJI") for punitive damages, which required HRP to establish Greenfield's evil mind by clear and convincing evidence, restricted the jury's discretion even more than the instructions the Supreme Court approved of in *Haslip* and *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 463, 113 S.Ct. 2711, 2723, 125 L.Ed.2d 366 (1993) (plurality opinion).[12] The more rigorous clear-and-convincing standard "constrain[s] the jury's discretion, limiting punitive damages to the more egregious cases."

---

12. The *Haslip* jury was instructed that it could award punitive damages if it was "reasonably satisfied from the evidence" that the defendant committed fraud. 499 U.S. at 6 n. 1, 111 S.Ct. at

1037 n. 1. The West Virginia jury in *TXO* was instructed to apply a preponderance-of-the-evidence standard. 509 U.S. at 463 n. 29, 113 S.Ct. at 2723 n. 29.

*Haslip,* 499 U.S. at 58, 111 S.Ct. at 1064 (O'Connor, J., dissenting).[13]

Winston & Strawn received a full hearing on its Motion For New Trial. The trial court first found that clear and convincing evidence supported the award of punitive damages. Then, regarding Winston & Strawn's contention that the punitive damages award was excessive, the court ruled:

> Although the amount of punitive damages awarded is large, based on the evidence presented concerning the financial worth of the Defendant, the amount can not be said to be indicative of passion or prejudice, but [based] upon the jury's consideration of the instruction and the purpose for which punitive damages are assessed.

The trial court's post-verdict review satisfied due process. *TXO Prod. Corp.,* 509 U.S. at 465–466, 113 S.Ct. at 2724 (due process satisfied where defendant received adequate hearing on post-verdict motion and judge indicated agreement with jury's verdict, even though judge did not explain basis for denial of motion on the record).

■ On appeal, we have considered Winston & Strawn's arguments in detail and reviewed the allegedly excessive punitive damages award under *Hawkins'* criteria. The award is proportionate to Winston & Strawn's financial position; it represents approximately 3.1 percent of the firm's gross revenues for 1990. The record supports the jury's determination that for almost a year Winston & Strawn, through Greenfield, consciously disregarded its client's interests, tried to shift all liability for a potential $3.6 millon judgment from a more favored client to HRP, and concealed this conduct from HRP. The punitive damage award is less than half of what HRP requested, less than three times HRP's compensatory damages, and significantly less than the liability that Greenfield sought to have HRP bear.[14] We conclude that the award serves the goals of punishment and deterrence without financially devastating Winston & Strawn.

### 5. Is Winston & Strawn entitled to a remittitur?

Winston & Strawn requests remittitur of the punitive damages award, arguing that HRP inflamed the jury during its closing argument with references to the AzScam and savings and loan scandals, and characterizations of Winston & Strawn as "huge," "powerful," and "rich."[15] The trial court specifically concluded that the verdict against Winston & Strawn did not result from passion or prejudice, but rather from the jury's consideration of clear and convincing evidence of an evil mind and the purposes of punitive damages.

13. We note that the Supreme Court recently held that Oregon's clear-and-convincing standard of proof and detailed jury instructions alone do not adequately constrain a jury's discretion to award punitive damages; punitive awards must be subject to judicial review. *Honda Motor Co.,* — U.S. at ——, 114 S.Ct. at 2331. Oregon was unique in abrogating the common law's protection against arbitrary punitive damage awards through judicial review. *Id.* at ——, 114 S.Ct. at 2338–39. "No Oregon court for more than half a century [had] inferred passion and prejudice from the size of a damages award, and no court in more than a decade [had] even hinted that courts might possess the power to do so." *Id.* at ——, 114 S.Ct. at 2339.

In contrast, Arizona provides detailed and meaningful post-verdict judicial review in its trial, and appellate courts. *See Hawkins,* 152 Ariz. at 501–04, 733 P.2d at 1084–87; *Carter–Glogau Lab.,* 153 Ariz. at 358, 736 P.2d at 1170; *Maxwell,* 143 Ariz. at 218–19, 693 P.2d at 361–62.

14. *Cf. TXO Prod. Corp.,* 509 U.S. at 459–462, 113 S.Ct. at 2721–23 (holding that a punitive damages award that was 526 times greater than the actual damages award was nonetheless reasonable in light of the potential for harm from defendant's conduct, defendant's wealth, and profits defendant hoped to achieve); *Haslip,* 499 U.S. at 23, 111 S.Ct. at 1046 (upholding punitive damages award four times greater than the amount of compensatory damages).

15. Winston & Strawn's counsel made similar remarks about HRP throughout the trial. His opening statement referred to one of HRP's partners as a "multi-millionaire." During testimony, when referring to another of HRP's partners, he stated "They had money. They had a lot of money. They're multi-millionaires, aren't they?" and "[H]e could walk in this courtroom and write a check for a million dollars on anything he wanted to." In his closing argument, he characterized Sam Shapiro as "one of the most influential, one of the richest, one of the most powerful men in the state of Arizona," and HRP as "Some very rich people [who] decided to build a hotel ... with [the] help of their very rich friend to make a lot of money."

"Where the trial court has refused to interfere with the jury's determination of damages, this court cannot interpose its own judgment on the issue unless convinced that the verdict is so excessive as to suggest passion or prejudice." *Nienstedt v. Wetzel,* 133 Ariz. 348, 357, 651 P.2d 876, 885 (App. 1982). We accord the greatest possible discretion to the trial court because, like the jury, it has had the opportunity to hear the witnesses and observe the demeanor of witnesses. *Carter–Glogau Lab.,* 153 Ariz. at 358, 736 P.2d at 1170.

We hold that the trial court did not abuse its discretion when it denied Winston & Strawn's request for remittitur. As discussed above, the *Hawkins* factors fully support the verdict and the trial court's decision not to interfere with it.

### B. Did Winston & Strawn Assume CG & I's Contingent Tort Liability?

■ Prior to trial, Winston & Strawn filed a consolidated Motion For Partial Summary Judgment And Motion In Limine requesting a ruling that it had no liability for CG & I's acts in the Form–Eze case prior to the merger on March 1, 1981, and to exclude evidence of CG & I's pre-merger acts. Because the Motion For Partial Summary Judgment was filed too late, the trial court ordered *sua sponte* that it would consider only the Motion In Limine. However, HRP argued that the summary judgment issues were inextricably intertwined with the evidentiary issues; the trial court permitted HRP to file a response to the consolidated motion. The trial court denied the Motion In Limine holding that "pursuant to principles of partnership law and under the agreement of the parties, Winston & Strawn is liable for any alleged malpractice for which the Craig, Greenfield & Irwin partnership had liability." At the close of the evidence, the court instructed the jury that Winston & Strawn was responsible as a matter of law for any acts committed by CG & I after July 1, 1978.

Winston & Strawn argues that under the Uniform Partnership Act ("UPA"), A.R.S. sections 29–201 to –244 (1989), Winston & Strawn was only liable for those CG & I liabilities which it contractually assumed.

According to Winston & Strawn, whether it assumed liability for HRP's malpractice claim was a factual issue which should have gone to the jury. We disagree.

Winston & Strawn's consolidated motion asserted: "On March 1, 1981, the firms of Craig, Greenfield & Irwin and Winston & Strawn merged their practices in Phoenix, Arizona under the name 'Winston & Strawn'...." Legally, three things happened upon the merger. First, the "old" Winston & Strawn dissolved when it accepted the incoming CG & I partners. *See* A.R.S. §§ 29–229, 231; *Johnson v. Hill,* 1 Ariz.App. 290, 291, 402 P.2d 225, 226 (1965). Second, the "old" CG & I dissolved when it accepted the incoming Winston & Strawn partners. *See id.* Third, a "new" partnership known as Winston & Strawn was created and continued the business of both of the old partnerships. *See id.* Neither CG & I nor the old Winston & Strawn liquidated their affairs before dissolving.

The dispositive issue is the extent of the new combined partnership's responsibility for the liabilities of the dissolved partnerships, the former Winston & Strawn and the former CG & I. Winston & Strawn asserts that A.R.S. section 29–241(D) ("UPA section 41(4)") shields it from liability for HRP's malpractice claim against CG & I because Winston & Strawn did not promise to assume that liability. UPA section 41(4) provides:

> When all the partners ... assign their rights in partnership property to one or more third persons who promise to pay the debts and who continue the business of the dissolved partnership, creditors of the dissolved partnership are also creditors of the person or partnership continuing the business.

The Official Comment provides that UPA section 41(4) "does not apply to the case where the third person or persons do not promise to pay the debts of the dissolved partnership. In that case the creditors of the dissolved partnership have no claim on the partnership continuing the business or its property...." 6 U.P.A. § 41, at 513 (1969).

We conclude, however, that UPA section 41(4) is inapplicable to the CG & I—Winston

& Strawn merger. UPA section 41(4) applies only when *"all* the partners ... assign their rights in partnership property to one or more *third* persons." (emphasis added). Thus, on its face, this subsection applies only when none of the existing partners continues his association with the ongoing business. That is not what happened here. CG & I's partners simply continued their business under Winston & Strawn's name.

When a partnership such as CG & I dissolves "without liquidation of partnership affairs, creditors of the first or dissolved partnership are also creditors of the partnership so continuing the business." A.R.S. § 29–241(A) ("UPA section 41(1)"). The Official Comment to UPA section 41(1) explains that this subsection is intended to apply precisely to situations like the CG & I–Winston & Strawn merger:

> The paragraph as a whole, as well as [the] entire section, is based on the opinion that when there is a continuous business carried on first by A, B, and C, and then by A, B, C and D, or by B or C ... or by B, C, and D, without any liquidation of the affairs of A, B, [and] C, both justice and business convenience require that all the creditors of the business, irrespective of the exact grouping of the owners at the times their respective claims had their origin, should be treated alike, all being given an equal claim on the property embarked in the business.

6 U.P.A. § 41, at 512. In making the creditors of the first partnership creditors of the second, this subsection prevents an assignment of the first partnership's property from affecting the rights of the first partnership's creditors. *Id.* We hold that the trial court properly charged Winston & Strawn with CG & I's contingent tort liability under UPA section 41(1) because CG & I's affairs were not liquidated upon the merger.

### C. Did The Trial Court Improperly Instruct The Jury On The Applicable Negligence Standard?

■ Winston & Strawn complains that the trial court erred by refusing a tendered instruction which articulated the causation element in the "but for" language from legal malpractice caselaw. *See Molever*, 152 Ariz. at 374, 732 P.2d at 1112 (in legal malpractice

case "the client's recovery depends on a showing that 'but for' the alleged negligence of the attorney the injury complained of would not have occurred"); *Phillips v. Clancy*, 152 Ariz. at 418, 733 P.2d at 303. Winston & Strawn argues that the trial court obfuscated the jury's inquiry by stating that the jury need only find that malpractice was "a cause" of HRP's economic loss, and that it "helped" to produce the loss, and then stating that the jury must find that HRP's loss would not have happened "without" the malpractice. Winston & Strawn maintains that although it did not object at trial, the failure to properly instruct on the basic issue of proximate cause is fundamental error which cannot be waived. *See Trojanovich v. Marshall*, 95 Ariz. 145, 146, 388 P.2d 149, 150 (1963).

We hold that Winston & Strawn waived all but fundamental error by not objecting to the jury instruction. We further hold that if there was any error, it was not fundamental because the instruction gave the basic outline of the law on legal malpractice. *Bradshaw*, 157 Ariz. at 419–20, 758 P.2d at 1321–22 (objection to improper jury instruction on probable cause element in malicious prosecution was waived where defendant did not object to final form of instruction; instruction was not fundamental error because it gave basic outline of legal test). The trial court's instruction stated: "Malpractice causes economic loss if it helps to produce the loss and the economic loss *would not have happened without the malpractice.*" (emphasis added). This emphasized language has the same meaning as the "but for" formulation, and it is the preferred instruction in negligence cases. *See* RAJI (Civil) Second Fault 2 (1991). Since legal malpractice is only a species of negligence, there is no special importance to the "but for" formulation.

### D. Was HRP Entitled To Prejudgment Interest?

■ A party's entitlement to prejudgment interest depends on whether his or her claim is "liquidated." *Schade v. Diethrich*, 158 Ariz. 1, 14, 760 P.2d 1050, 1063 (1988). "A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, with-

out reliance upon opinion or discretion." *Id.* (quoting Charles T. McCormick, *Damages* § 54 (1935)). If a claim is liquidated, then prejudgment interest is a matter of right. *Id.*

■ Winston & Strawn argues that HRP's compensatory damages were not liquidated because the jury had discretion to hold Winston & Strawn liable for less than the whole amount of HRP's liability to Form–Eze and Inryco. The trial court instructed the jury that Winston & Strawn was only responsible for Greenfield's acts after July 1, 1978. Thus, Winston & Strawn argues, the jury could have found that some or all of HRP's liability to Form–Eze and Inryco was caused by Greenfield prior to that date and that Winston & Strawn was not responsible for that liability.

This argument ignores the fact that although Winston & Strawn's liability for HRP's compensatory damages was disputed, the *amount* of those damages was not. "The mere fact that the parties dispute a claim does not defeat the allowance of interest." *La Paz County v. Yuma County,* 153 Ariz. 162, 168, 735 P.2d 772, 778 (1987); *see also Hall v. Schulte,* 172 Ariz. 279, 284, 836 P.2d 989, 994 (App.1992) (holding that derivative liability claim was liquidated even though derivative liability was disputed). The verdict amount comprised three exact amounts: two types of HRP's attorneys' fees and the amount that HRP paid on the judgment in the Form–Eze litigation. Once the jury decided that Winston & Strawn caused HRP's loss in the Form–Eze litigation, the amount of Winston & Strawn's liability to HRP was certain. Therefore we affirm the trial court's award of prejudgment interest.

**E. Did The Trial Court Err In Crediting, As Partial Satisfaction Of The Jury's Award Against Winston & Strawn, Settlement Payments Received By HRP Prior To Trial From CG & I And Greenfield?**

Months prior to trial, HRP reached a settlement with CG & I and Greenfield, or more specifically, with their two malpractice insurers who provided coverage for the period before March 1, 1981, when CG & I merged with Winston & Strawn. HRP allocated $1 million of the settlement to punitive damages, and the remaining $500,000 to compensatory damages.

Winston & Strawn did not raise any credit issues between the May verdict and the September entry of final judgment, although it did raise other objections during this period. Winston & Strawn's first claim to a credit appeared in its post-judgment Motion For New Trial Or, In The Alternative, To Alter Or Amend Judgment. The trial court ruled that although the credit issue was not properly a part of the motion, the pre-trial settlement payments operated as partial satisfactions of the compensatory and punitive damage awards against Winston & Strawn.

*1. Credit against the compensatory award*

■ On cross-appeal, HRP argues that when a co-defendant makes a payment on a plaintiff's claim prior to the entry of the final judgment, a non-settling defendant who knows of that payment must advance its request for credit before the judgment is entered. Under the unique facts in this case we cannot agree and therefore we affirm the trial court's grant of credit on the compensatory damages.

■ In Arizona, a joint tortfeasor is entitled to have the amount of another joint tortfeasor's settlement applied in reduction of the plaintiff's claim. A.R.S. § 12–2504 (1994); *Egurrola v. Szychowski,* 95 Ariz. 194, 198, 388 P.2d 242, 245 (1964). Winston & Strawn, however, sought to have HRP's judgment, not HRP's underlying claim, reduced by the co-defendants' settlement payments.[16]

Public policy demands that there be an end to litigation. The common good of society

---

16. Of course if a judgment is entered before a party becomes aware of facts which require a new trial or relief from the judgment, the party can bring appropriate post-judgment motions.

Ariz.R.Civ.P. 59(a) (allowing for new trial when party discovers material evidence which could not have been discovered and produced at trial); Ariz.R.Civ.P. 60(c) (allowing for relief from judg-

as a whole and of the litigants in particular, requires that there be an end to strife for the purpose of producing certainty as to individual rights and to promote dignity and respect for judicial proceedings.

*Lee v. Johnson,* 70 Ariz. 122, 127, 216 P.2d 722, 725 (1950). Thus, a defendant requesting the court to apply the amount of another joint tortfeasor's payment to reduce the plaintiff's claim should do so before judgment is entered.

Winston & Strawn cites *American Home Assurance Co. v. Vaughn,* 21 Ariz.App. 190, 192, 517 P.2d 1083, 1085 (1974), for the proposition that it was entitled to wait until after the judgment was entered on HRP's claim before it sought credit for the codefendants' pre-trial settlement payments. In *Vaughn* a defendant against whom a judgment had been entered moved the trial court to reduce the judgment by an amount that settling codefendants had paid the plaintiff before trial. Reversing the trial court's denial of the motion, this court held that "a settlement by one or more of the defendants is to be credited against any judgment rendered against the defendant who is held liable." *Id.* at 193, 517 P.2d at 1086.

We do not think that *Vaughn* is dispositive. *Vaughn* did not address whether a defendant's post-judgment motion to reduce damages comes too late, and apparently no one raised this issue. Moreover, the two Arizona Supreme Court cases which *Vaughn* cited in support of its holding actually indicate that a defendant must raise credit issues *before* the court enters the judgment. *See Adams v. Dion,* 109 Ariz. 308, 309, 509 P.2d 201, 202 (1973); *Egurrola,* 95 Ariz. at 198, 388 P.2d at 245. In *Dion,* the court's statement that any settlement amount "must be credited *on* any judgment received against the other [co-defendant]," 109 Ariz. at 309, 509 P.2d at 202 (emphasis added), suggests by its use of "on" instead of "against," that the judgment actually entered should reflect the appropriate reduction, and hence credit issues should be determined prior to judg-

ment. In *Egurrola* the court explained that evidence of a co-defendant's settlement should not be presented to the jury, but that the credit issue should be addressed "after the jury has returned its verdict." 95 Ariz. at 198, 388 P.2d at 245. This suggests that credit issues should be determined before the court enters judgment.

Our supreme court directly addressed this issue in *Evans v. Valley Radiologists Ltd.,* 127 Ariz. 177, 180, 619 P.2d 5, 8 (1980). In *Evans,* the defendant filed a post-judgment motion seeking credit for payments it had made to the plaintiff on the debt which had been litigated at trial. The supreme court held that the defendant's request for credit came too late: "[A]ppellant's failure to raise the issue before judgment was entered waived any right to a reduction in the amount of the judgment...." *Id.* Like the defendant in *Evans,* Winston & Strawn sat on its right and did not seek credit until after the judgment was entered.

In this case we cannot apply this holding because the trial judge instructed the jury that they should determine the full amount of damages suffered by HRP and that she, as the trial judge, would prevent any "double recovery." The Settlement Agreement between HRP and CG & I and its partner Greenfield (or more specifically their two malpractice insurers) stated:

> Nothing 'in this Settlement Agreement shall release, waive or impair any claims, rights or causes of action HRP and the two insurers or any of them have now or may have in the future against Winston & Strawn, its individual partners and its professional liability insurer for the lawsuit.

It appears that the trial judge reasoned that the pre-trial settlements could be treated, pursuant to Rule 60(c)(5), as a partial satisfaction of the judgment entered against Winston & Strawn. Thus the trial judge conceptualized the final judgment which was against Winston & Strawn only, as being the same as a judgment, jointly and severally, against Winston & Strawn, Greenfield, and

---

ment for mistake, inadvertence, surprise, newly discovered evidence, etc.).

Winston & Strawn does not dispute that it was fully aware of its co-defendants' pre-trial settle-

ments, and it offers no explanation for its failure to request credit prior to the entry of judgment.

CG & I, so that pre-trial payments by CG & I and Greenfield amounted to partial satisfaction of what the trial judge apparently believed to be a "joint and several" judgment. Rule 60(c)(5) provides:

> On motion and upon such terms as are just the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (5) the judgment has been satisfied, released or discharged, or a prior judgment on which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.

To apply Rule 60(c)(5) is to avoid a double recovery of the same damages in this case since the jury returned compensatory damages in the exact amount of $1,238,568, which was based "to the dollar" on the total amount HRP paid to satisfy the judgment entered against it in the Form–Eze litigation, plus attorneys' fees incurred.

We agree that the better practice would have been for Winston & Strawn to have pled the settlement as an affirmative defense pursuant to Rule 8(c), Arizona Rules of Civil Procedure. Winston & Strawn did not do so. However the judge instructed the jury to find the full amount of compensatory damages suffered by HRP and she would prevent any double recovery by virtue of the settlement. When HRP introduced a post-trial claim that Winston & Strawn was not entitled to an offset, the trial court observed:

> And frankly, I was really surprised to read that there was some claim that there was no entitlement to a credit because of a procedural problem on at least the half a million dollars that was received by plaintiffs to settle the compensatory damages claim against Greenfield and Craig, Greenfield and Irwin.
>
> \* \* \* \* \* \*
>
> I thought that this was just absolute that everybody understood and there was going to be no question that Mr.—that HRP can't recover twice under any circumstances, and that is in fact what the result would be if I don't apply the credit.

The trial court committed no error in keeping its promise to the jury and rejecting the claim by HRP in regard to the compensatory damages. This part of the cross-appeal is affirmed.

### 2. Credit against the punitive award

We reverse the credit for punitive damages. After the trial the trial court assumed that because the respondeat superior theory for Greenfield's conduct was the only basis for holding Winston & Strawn liable, any settlement payments for Greenfield's conduct reduced Winston & Strawn's liability. This assumption was wrong as a matter of law because punitive damages may be assessed against an employee and his employer, and even though the employer is liable only in respondeat superior, the employer will be liable for the separate assessment against it. *Wilson v. Riley Whittle, Inc.*, 145 Ariz. 317, 322, 701 P.2d 575, 580 (App.1984).

The trial court's assumption was also wrong as a matter of fact because the jury awarded punitive damages for Greenfield's post-March 1, 1981 conduct, while the pre-trial settlement was for Greenfield's pre-March 1, 1981 conduct. The jury was instructed that in deciding whether to award punitive damages against Winston & Strawn, "you may only consider the actions of Mr. Greenfield that took place after he joined Winston and Strawn on March 1, 1981." Thus, although the same person (Greenfield) committed all the wrongful acts, the settlement was for different conduct than the jury award. Therefore the trial court erred in crediting payment for one set of acts against the jury's award for another set of acts. Furthermore, the trial court had instructed the jury that it could assess punitive damages against Winston & Strawn for the actions of it and Greenfield occurring after March 1, 1981. We must assume on review that the jury followed the instructions of the trial court. *Perkins v. Komarnyckyj*, 172 Ariz. 115, 834 P.2d 1260 (1992). In Post–Trial Orders the trial judge stated that she felt bound by respondeat superior to award punitive damages against Winston & Strawn, but that since the jury's award of punitive

damages against Winston & Strawn was solely on the basis of respondeat superior, the court ordered that the $1 million HRP received in settlement of its punitive damage claims against Greenfield and CG & I would be credited against the punitive damages awarded against Winston & Strawn. However, the one satisfaction rule is inapplicable to punitive damage awards. The rule only applies to awards which *compensate* for injuries, not awards intended to deter and punish. Winston & Strawn accepted the benefit at trial of an instruction from the court that its punitive damage liability was limited solely to acts occurring *after* March 1, 1981. Moreover, Winston & Strawn also accepted the benefit of the trial court's ruling that its merger with CG & I did *not* result in the "new Winston & Strawn" assuming punitive damage liability for CG & I's and Greenfield's prior conduct.

The rationale of the one injury/one compensation principle is simply that the plaintiff is not entitled to be compensated twice for the same injury; in contrast, the purpose of a punitive damage award is to punish. Accordingly, the fundamental rationale of the credit rule is absent when punitive damages are involved. *Bosco v. Serhant*, 836 F.2d 271, 280–81 (7th Cir.1987).

The dissent makes oddly contradictory arguments—the first being that all damage done to HRP was done before March 1, 1981, and the second being that Winston & Strawn should get $1 million credit for damages which it did not cause under the dissent's theory. Before trial, the trial court expressed concern about a double recovery and advised the jury that she, as the judge, would see that no double recovery of the compensatory damages in favor of HRP occurred. She avoided the double recovery problem as to punitive damages by instructing the jury that it could only find punitive damages against Winston & Strawn for acts occurring after March 1, 1981. Winston & Strawn assumed CG & I's contingent tort liability for compensatory damages purposes only.

As to the dissent's point regarding final argument, both parties in this case had very experienced, competent counsel who knew well what they were doing and what trial advocacy is all about. However, our standard of review as an appellate court is to consider the facts and all inferences in the light most favorable to sustaining the jury verdict and resulting judgment as we stated in the beginning of this opinion. There is no question that this trial judge did an excellent job with a very complex piece of litigation.

## IV. *CONCLUSION*

We affirm the jury's award of compensatory and punitive damages to HRP. We also affirm the trial court's award of prejudgment interest. We affirm the trial court's grant of credit to Winston & Strawn for $500,000 pretrial settlement payments by Greenfield and CG & I for HRP's compensatory damages. However, we reverse the trial court's grant of credit for $1 million against the jury's punitive damage award. Accordingly, we remand to the trial court for entry of judgment in accordance with this opinion. Pursuant to A.R.S. section 12–342, we award HRP its costs on appeal upon compliance with Rule 21, Arizona Rules of Civil Appellate Procedure. Finally, we direct the Clerk of this Court to send a copy of this opinion to the State Bar of Arizona Disciplinary Commission for its review.

GARBARINO, P.J., concurs.

NOYES, Judge, concurring in part, dissenting in part.

I concur in the decision to affirm the compensatory damages offset; in all other regards, I respectfully dissent. In my opinion, the $3 million punitive damages penalty imposed on Winston & Strawn is both unconstitutional and unsupported by the evidence.

**A. Punitive Damages Offset:** I would reverse the punitive damages award. But if affirming, I would also affirm the punitive damages offset, for reasons explained by the trial court:

There is no evidence upon which punitive damages could be independently assessed against Winston & Strawn for any conduct separate and apart from the conduct of Greenfield. In this Court's view by agreeing to accept $1 million in punitive damages from Greenfield, the Plaintiff is also

required to credit that $1 million against the punitive damage award against Winston & Strawn. To allow recovery of the full $3 million would be allowing a double recovery of one-third of the punitive damages assessed because of Greenfield's conduct. The settlement effects a partial satisfaction of the punitive damages as well.

The reversal of the punitive damages offset gives HRP what the trial court regarded as a $1 million double recovery, and it penalizes Winston & Strawn $1 million more than the trial court had in mind when it denied the motion for remittitur. In light of these circumstances, I think it appropriate for counsel to request that the trial court reconsider the motion for remittitur.

**B. Vicarious Liability:** I agree that Arizona case law allows punitive damages for respondeat superior liability. I second the concerns expressed by the trial court regarding that law:

> While this Court has substantial doubts as to whether the purposes behind the award of punitive damages are served by the application of *respondeat superior*, particularly when the party whose conduct is the basis for the award of punitive damages is an experienced lawyer whose conduct is not subject to the same kind of supervision and close scrutiny as the conduct of many other types of employees, this Court is bound by appellate authority on this issue.

Winston & Strawn's argument that Arizona law should evolve to a position more in line with Restatement (Second) of Torts Section 909 (1979) is serious. What happened in this trial and appeal to Winston & Strawn is reason enough to reconsider Arizona law regarding vicarious liability for punitive damages.

If Greenfield was a "managerial agent" of Winston & Strawn, the partnership would be vicariously liable in punitive damages for his evil-minded conduct, even under Section 909. Whether Greenfield was a managerial agent, however, was never litigated; it was mooted by the trial court's directed verdict on vicarious liability. But the issue appears triable, if Section 909 becomes the law in Arizona.

**C. Evidence:** Assuming that the law allows punitive damages against Winston & Strawn here, the evidence does not support a $3 million penalty.

**1. The damage was done before March 1, 1981:** The trial court instructed the jury, "In deciding about punitive damages, you may only consider the actions of Mr. Greenfield that took place after he joined Winston & Strawn on March 1, 1981." (Although the start-date for compensatory damages was July 1, 1978, none of the parties complain about a March 1, 1981 start-date for punitive damages, so there is no issue on appeal about the correctness of that date.)

I submit that the record compels the conclusion that the evil-minded conduct of Greenfield had done its damage to HRP prior to March 1, 1981. True, Greenfield earned attorneys' fees after March 1, 1981, and can be faulted for certain behaviors after that date—such as the untimely and insensitive way in which he disclosed the Special Master's decision to HRP. But the real damage to HRP was done when the Special Master announced his liability verdict on December 8, 1980—three months *before* Greenfield joined Winston & Strawn.

The underlying lawsuit against HRP and Chanen was complex only in regard to damages. Liability turned on the testimony of one Chanen employee and one Form–Eze employee, and the question whether Chanen threw Form–Eze off the job on November 19, 1974. Trial was in March 1980—one year *before* Greenfield joined Winston & Strawn. The Special Master was the Honorable R. Porter Murry, a retired superior court judge. On December 8, 1980, Judge Murry announced that he needed more help from counsel in calculating damages, but he ruled from the bench on liability.

The jury in the Winston & Strawn trial was read numerous stipulations of fact, and stipulation 45 provided: "On December the 8th, 1980, the Special Master stated at a hearing that he had found in favor of Form–Eze and Inryco against both Chanen and HRP." After that, the only question left unresolved—and it was a complicated question—was the amount of damages the Special Master was going to award Form–Eze and

Inryco against *both* Chanen and HRP. The eventual award of massive damages resulted, not because Greenfield acted with an evil mind towards HRP, but because—for reasons later found by the district court to be in large part clearly erroneous—the Special Master found the Form–Eze and Inryco arguments on damages more persuasive than those of Greenfield and his associates on behalf of Chanen and HRP.

**2. Greenfield's pro-Chanen contract defense failed:** Greenfield has been faulted for arguing from the outset that Chanen was an agent and HRP was its disclosed principal and, therefore, any contract liability should be imposed solely on HRP. But the Special Master rejected this argument, the district court rejected it, and the Ninth Circuit rejected it. The district court adopted nearly all of the Special Master's liability findings and conclusions, including:

6. Chanen was acting as the agent of HRP when it negotiated and entered into the Equipment Lease and Labor Guarantee, and when it executed the Letter of Clarification. This agency relationship, however, was not disclosed to Form–Eze until after these agreements had been entered into.

35. As a result of Chanen unilaterally dismissing [Form–Eze] from the jobsite, the Labor Guarantee, including the Security Interest, was terminated as of November 19, 1974.

68. Since Chanen's agency was not disclosed as of the date on which the Form–Eze Equipment was leased, Chanen, or at Form–Eze's election, HRP is liable to Form–Eze for [contract damages].

78. The defendants' [Chanen and HRP] retention of the Inryco [formerly the Form–Eze] Equipment after July 30, 1975 was tortious, entitling Inryco under A.R.S. § 12–1301 *et seq.* to recover [tort damages].

**3. HRP and Chanen were united in their tort defense:** About eighty percent of the damages were tort damages for the wrongful detention of the forms. The Special Master awarded $3.6 million in damages, the district court reduced it to $800,000, and the Ninth Circuit raised it to $1.6 million. Of

the Ninth Circuit award, the contract damages were about $20,000 to Form–Eze and about $290,000 to Inryco. The other $1.29 million was for wrongful detention of the forms, and fair market value of the forms.

There was much evidence that HRP was jointly liable with Chanen for the wrongful detention of the forms, and there was no evidence that Greenfield's evil-minded conduct after March 1, 1981 was a cause of HRP's tort liability. From the time of their *1975* detention, the forms were stored at a facility owned by an HRP partner. An August 6, *1975* letter from HRP (Barry Shapiro) to Chanen said, in part:

[S]ubject to my talking to Art Greenfield when he returns, it would appear that the direction which we should pursue with Form–Eze is to continue to hold the forms at National Metals as a means of leverage in collecting at least some of the excess dollars which you figure they owe us.

One of the exhibits at trial was a "Letter Agreement" signed by Chanen and HRP on October 6, *1977*. This agreement provided that HRP would store the forms and that *HRP* would indemnify *Chanen* if it were later concluded that the detention of the forms was wrongful. (The agreement also provided that indemnification would not apply to damages attributable to the fault of Chanen.)

Another trial exhibit was a February 8, *1978* letter from Greenfield to HRP that began: "As you know, on numerous occasions in connection with this matter I have suggested that it would be more appropriate for the defendants other than Chanen Construction Company to be represented by separate counsel." The letter discussed the "disclosed agent" theory ("[I]t has always been the situation that Chanen Construction Company was sued as the agent of the disclosed principal, HRP Hotel Company. . . ."). The letter advised that Greenfield had been contacted by Inryco counsel with settlement overtures and that:

It seems imperative that the issue of utilization of the forms and perhaps even settlement of the entire litigation be vigorously pursued at this time. Accordingly, I

again most strongly urge that your representation in connection with this matter be undertaken by counsel who is more familiar with the various aspects of the HRP Hotel situation than I.

The point here is this: If there was malpractice by Greenfield regarding what he did or did not advise HRP to do with the forms, the malpractice affected Chanen and HRP equally, it was not done with an evil-minded favoring of Chanen over HRP, and it was done long before March 1, 1981—all of which means that there is no legal reason to penalize Winston & Strawn for that behavior.

**4. HRP's final argument:** During trial there was little mention of Winston & Strawn, until final argument. HRP's counsel, Robert A. Jensen, began his final argument by advising jurors that they could do nothing about the savings and loan scandals and they could do nothing about the AzScam scandal—except to pay higher taxes because of them—but they *could* do something about "one of the most powerful law firms in the country, Winston & Strawn." Regarding the gross revenues of Winston & Strawn, counsel said: "They're going to amaze you. They are rich and powerful." Counsel then referred for the first time in the trial to the Winston & Strawn financial statement (which was in evidence by stipulation) and advised that Winston & Strawn had over $97 million in gross revenues and that, if the jury were to impose, say, only $500,000 in punitive damages, "you're not even going to get their attention. They're not going to look up from their coffee. They're not going to rearrange their European vacations." Counsel then suggested penalizing Winston & Strawn one month's "wages," about $8 million. In rebuttal, counsel implored: "But please, I have watched all my life, representing plaintiffs as I do, the rich and the powerful get away with it. Don't let it happen here." Counsel closed with a suggestion that an award of punitive damages in the amount of "several million dollars" was appropriate.

HRP's call to arms against rich and powerful lawyers who "get away with it" has thus far succeeded with one Arizona jury and two Arizona courts—despite the fact that Winston & Strawn did nothing wrong. During argument on the motion for new trial, the trial court stated: "[E]verybody agreed that the only basis for punitive damages against Winston & Strawn was based on the conduct of Art Greenfield. It wasn't a claim that he was negligently hired or retained or supervised ... punitive damages were based exclusively on his conduct, correct, Mr. Jensen?" Jensen responded: "I believe that's a fair statement, Your Honor." That is indeed a fair statement, and it is also why $3 million is a fundamentally unfair penalty on Winston & Strawn.

HRP's final argument is not mentioned here because of alleged error in it; able opposing counsel made no objections to the argument and therefore waived any error. Rather, HRP's final argument is mentioned here to highlight the buttons that were pushed to produce this $3 million punishment of a blameless defendant. The jury did exactly what it was asked by HRP to do; it punished Winston & Strawn for wrongs much greater than—and wrongs completely unrelated to—the evil-minded conduct of Arthur P. Greenfield after March 1, 1981.

**D. Measure of damages:** Greenfield was the wrongdoer, and it is his financial condition that should have been relevant, not Winston & Strawn's. See *Shetka v. Kueppers, Kueppers, Von Feldt and Salmen,* 454 N.W.2d 916 (Minn.1990), another case in which a law firm was held vicariously responsible for the evil-minded conduct of a partner—though in that case, the firm had dissolved and the vicarious liability was passed to the other partners. The *Shetka* court concluded that "for the purpose of determining the amount of a punitive damage award, the financial condition of a nonparticipating, nonculpable vicariously liable party is irrelevant, and, therefore, not discoverable." *Id.* at 919.

In *Wilson v. Riley Whittle, Inc.,* this Court held that "the trier of fact can award a higher amount of punitive damages against the master than the amount awarded against the servant." 145 Ariz. 317, 322, 701 P.2d 575, 580 (App.1985). Even if the *Wilson* rule has merit regarding masters and servants, *Shetka* expresses a better rule for partnerships.

Assuming that the evidence supported any award of punitive damages for Greenfield's evil-minded conduct after March 1, 1981, the gross (or net) revenues of Winston & Strawn are an unfair measure of punishment. By comparison, all direct and vicarious liability for Greenfield's evil-minded conduct for the sixty-eight-month period from July 1975 to March 1981 was settled for a $1 million penalty. Winston & Strawn's exposure for Greenfield's conduct was six months, March to September, 1981. That Winston & Strawn had the misfortune of hiring Greenfield when it did, rather than six months later, is no reason for a $3 million penalty.

**E. Due Process:** If the factors required by *Haslip* and *Hawkins* are properly considered, I respectfully submit that the punitive damages penalty imposed on Winston & Strawn is unconstitutional, a taking without due process of law.

The trial court affirmed the award of punitive damages mainly because "based on the evidence presented concerning the financial worth of the Defendant [Winston & Strawn], the amount can not be said to be indicative of passion or prejudice." The majority relies on the same sort of quantitative analysis, finding that: "The award is proportionate to Winston & Strawn's financial position; it represents approximately 3.1 percent of the firm's gross revenues for 1990." Maj. at 135, 907 P.2d at 521. With respect, there is more to a punitive damages due process analysis than mathematics, especially when the defendant did nothing wrong. When measuring the fundamental fairness of a multi-million dollar punitive damages taking, especially on a vicarious liability theory, the court must articulate good reason for that penalty, something with more persuasive relationship to traditional notions of fundamental fairness than simply saying, "The defendant can pay it."

*Haslip* provides that "the fact finder must be guided by more than the defendant's net worth"; it also provides numerous factors to consider in the due process analysis, and advises that because those factors are applied by reviewing courts in Alabama, "Alabama plaintiffs do not enjoy a windfall because they have the good fortune to have a

defendant with a deep pocket." 499 U.S. at 21–22, 111 S.Ct. at 1045. Thus far, the same cannot be said about this Arizona plaintiff.

The punitive damages award should be reversed; failing that, the punitive damages offset should be affirmed.