NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

KEVIN ERDMANN, an Arizona resident, Plaintiff/Appellee

and

KERRY LECHNER, a Wisconsin resident, Cross-Plaintiff/Appellee,

v.

KENT Aka BRIGHAM BURTON and CARLY BURTON, as Arizona
residents and husband and wife; BURTON PARTNERS, LLC, an Arizona
limited liability company; ZYRAX, LLC, an Arizona limited liability
company, Defendants/Cross-Defendants/Appellants.

No. CA-CV 14-0410
FILED 5-26-2016

Appeal from the Superior Court in Maricopa
No. CV2011-096995
The Honorable Randall H. Warner, Judge

**AFFIRMED**

COUNSEL

Udall Shumway, PLC, Mesa
By Joel E. Sannes
*Counsel for Plaintiff/Appellee Erdmann*

Cassett Ricker Law PLLC, Scottsdale
By Keith C. Ricker
*Counsel for Cross-Plaintiff/Appellee Lechner*

Law Office of Julia Prinz, Pinetop
By Julia Marie Prinz
and
By Seth Kretzer, Bronstone, PA
*Co-Counsel for Defendants/Cross-Defendants/Appellants*

---

### MEMORANDUM DECISION

Judge John C. Gemmill delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Kent E. Cattani joined.

---

**G E M M I L L**, Judge:

**¶1**　　　　Kent (aka Brigham) Burton, Carly Burton, Burton Partners, LLC, and Zyrax (collectively "Burton") appeal a jury verdict and judgment finding them liable to Kevin Erdmann and Kerry Lechner on claims arising from various transactions involving the purchase and sale of two businesses. We affirm.

### BACKGROUND

**¶2**　　　　This dispute arises from two separate business transactions. The first transaction was Erdmann's sale of Kebko (a sign manufacturing company) to Burton. The second was Burton's sale of House Hunters (a monthly real estate publication) to Lechner, followed by the assignment by Burton to Erdmann of a promissory note evidencing a debt owed by Lechner to Burton.

### I.　　Kebko

**¶3**　　　　Kebko was a sole proprietorship created by Erdmann in 1993. Kebko manufactured signs primarily for general contractors, schools, courthouses, and various municipal buildings. In May 2010, Burton entered into an agreement to purchase Kebko from Erdmann. The price was $110,000, with a $55,000 down payment and $55,000 to be paid over time, as evidenced by a promissory note ("Kebko Note") secured by a chattel security agreement and a UCC financing statement.

**¶4**　　　　Almost immediately after purchasing Kebko, Burton contacted Erdmann to explain that he was having difficulty getting credit from banks and suppliers to obtain materials. Erdmann agreed to let

2

Burton use several supplier accounts and a Wells Fargo line of credit that were in Erdmann's name and for which Erdmann was personally responsible. The arrangement initially was unwritten, but in September 2010, Erdmann and Burton entered into a detailed written extension agreement.[1]

¶5 The extension agreement subordinated Erdmann's interest in the Kebko Note until January 2011 to allow Burton to factor[2] some of Kebko's accounts receivable for short-term operational funding. In exchange, Burton agreed to pay off all vendor accounts that were guaranteed in Erdmann's name, as well as Erdmann's Wells Fargo line of credit, within a specific amount of time.

¶6 By the time the extension agreement expired, Burton had not paid off the accounts and Erdmann had paid some of them himself. The amount of credit the vendors had extended to Burton, guaranteed by Erdmann, exceeded $40,000. Additionally, Burton cashed four checks totaling $3,271 that should have been forwarded to Erdmann under the extension agreement.

¶7 In April 2011, Burton and Erdmann entered into a settlement agreement and mutual release. Under the settlement agreement, Erdmann agreed to release Burton from any and all claims related to the vendor accounts and credit lines in exchange for Burton assigning to Erdmann 30 payments, together worth approximately $20,000, owed to Burton by Lechner on a note for the purchase of a business called House Hunters ("House Hunters Note"). Burton also agreed to pay off the factoring company to put Erdmann back in first position on the Kebko Note. Burton assigned the House Hunters Note to Erdmann, and Lechner began making payments to Erdmann.

¶8 After the date of the settlement agreement, Burton made only one more payment on the original Kebko Note. At trial, Burton asserted

[1] At some point after Burton purchased Kebko from Erdmann but before the extension and settlement agreements, Burton conveyed Kebko to Burton Partners, LLC. Both the extension agreement and the settlement agreement were signed by Kent Burton individually and as a member of Burton Partners, LLC.

[2] Factoring is a process by which a company sells an account receivable at a discounted price.

that the payment had been a mistake because he believed the Kebko Note had been forgiven through the settlement agreement. The settlement agreement, however, contained several references to the continuing existence of the Kebko Note. Furthermore, after Burton made the purportedly mistaken payment, he offered to buy the Kebko Note from Erdmann for almost half its value, and then apologized for getting behind on payments. When asked at trial why he would offer to buy a note he no longer believed existed, Burton responded "[b]ecause I'm a nice guy."

¶9 Burton also told Lechner, "I'm okay putting the [House Hunters] note payments on hold for as long as it takes to get you profitable again." At that point, Lechner ceased payments to Erdmann on the note. See infra ¶ 13.

¶10 Eventually Burton advertised to sell Kebko for $285,000. He stated in the ad that the company had an annual cash flow of $120,000. An interested party, DPG Investments ("DPG"), initially offered $235,000. Burton testified that at that point, one year after he purchased it from Erdmann, he believed Kebko was worth $235,000 and that he had built Kebko up to be worth more than when he had purchased it. Burton ultimately sold Kebko to DPG in July 2011 for $150,000 — two and a half times what DPG privately believed the cash flow was.

¶11 Just before selling Kebko, Burton unilaterally filed a UCC termination with the Arizona Secretary of State removing Erdmann's lien on Kebko, assertedly because he thought the Kebko Note was cancelled in the settlement agreement. But this was despite the facts that he had made a payment on the Kebko Note after the settlement agreement, apologized for his late payment, and offered to buy back the note. *See supra* ¶ 8. The UCC security agreement was ultimately restored, thereby protecting Erdmann's claim to a portion of the $150,000 DPG paid to Burton for Kebko.

## II. House Hunters

¶12 Burton first acquired House Hunters in 2009 for $28,000. Burton decided to sell House Hunters approximately one year later, and in October 2010, Lechner contacted Burton to express an interest in buying House Hunters.[3] Burton provided Lechner with some financial statements and personal assurances, but he would not provide Lechner with verifying

---

[3] After his purchase of House Hunters and before selling it to Lechner, Burton conveyed House Hunters to Zyrax, LLC.

information, such as the company's top-ten paying client list or a list of the companies that printed and distributed the magazine. Nevertheless, in December 2010, Lechner agreed to purchase House Hunters for a $20,000 down payment and a $78,000 promissory note (the House Hunters Note) to be paid over ten years.

¶13 Lechner operated House Hunters from January until June, 2011, losing money each month. Shortly thereafter, Lechner contacted Burton and detailed the trouble he was having bringing in revenue. At that point, Lechner questioned the reliability of the financial statements, client lists, and representations Burton had made about the company. After some discussion, Burton told Lechner that he (Lechner) could put payments to Erdmann on the House Hunters Note on hold until House Hunters became profitable again. *See supra* ¶ 9.

### III. Trial

¶14 Erdmann filed a complaint against Burton and Lechner for breach of contract and conversion. Several days later, Erdmann filed an amended complaint adding Burton Partners, LLC, and Zyrax, LLC, as parties and asserting additional claims for fraudulent inducement and intentional interference with contract. Burton filed a counterclaim against Erdmann, and Lechner filed a cross-claim against Burton for breach of contract, fraudulent inducement, negligent misrepresentation, non-disclosure, consumer fraud, breach of the covenant of good faith and fair dealing, and unjust enrichment.

¶15 After four days of trial, the jury returned a verdict finding against Burton on all counts, including: (1) for Erdmann on his claims against Burton; (2) for Erdmann on his claims against Burton Partners, LLC; (3) for Erdmann on his claims against Zyrax; (4) for Erdmann on his claim against Burton and Burton Partners for punitive damages; (5) for Lechner on his claims against Zyrax; (6) for Lechner on his claims against Burton; and (7) for Lechner on his claims against Burton and Zyrax for punitive damages. The jury found against Erdmann on his claims against Lechner, and against Burton on his claims against Lechner and Erdmann. Additionally, the jury returned three interrogatories that found for Lechner against Burton and/or Zyrax for fraud, and for Erdmann against Burton and/or Burton Partners for fraud and conversion.

¶16 The trial court entered judgment in favor of Erdmann against Burton in the amounts of $39,917.48 for compensatory damages, $93,235.60

for punitive damages, and $51,556.28 for attorney fees and costs. The trial court entered judgment in favor of Lechner against Burton and Zyrax in the amounts of $25,793.10 for compensatory damages against Zyrax, $30,346.19 for compensatory damages against Burton, $15,000 for punitive damages against Burton and Zyrax, and $24,605 for attorney fees. Burton filed a motion for new trial that was denied. Burton timely appeals. This court has jurisdiction under Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) and -2101(A)(1).

**ANALYSIS**

¶17 Burton presents five issues on appeal, which we address in the following sequence. First, whether the settlement agreement contained a clause that precluded either party from rescinding the agreement due to misrepresentation. Next, whether the trial court should have forced Erdmann to elect a remedy. Third, whether the trial court's failure to rule on piercing the veil regarding Burton's relationship to Burton Partners exacerbated juror confusion and led to duplicative damages. Fourth, whether Erdmann and Lechner's tort claims were barred by the economic loss doctrine (ELD). And, finally, whether Erdmann and Lechner were entitled to punitive damages.

I. **Burton Waived His Contention That the Settlement Agreement Precludes Rescission**

¶18 Burton argues that paragraph 6 of the settlement agreement precludes any rescission of the agreement due to misrepresentation or fraud.[4] This provision was raised in Burton's initial answer and his unsuccessful motion to dismiss. At trial, the settlement agreement itself

---

[4] Paragraph 6 of the settlement agreement provides:

> No Reliance on a Party. In entering into this Agreement, each party assumes the risk of any misrepresentation, concealment or mistake. If any party should subsequently discover that any fact relied upon by the party in entering into this Agreement was untrue or that any fact was concealed from that party or that the party's understanding of the facts or of the law was incorrect, such party shall not be entitled to any relief in connection therewith including, without limitation upon the generality of the foregoing, any alleged right or claim to set aside or rescind this Agreement. This Agreement is intended to be and is final and binding upon the parties.

was entered into evidence for the jury to consider.  But Burton did not ask the court to rule at trial as a matter of law that paragraph 6 precludes any rescission of the agreement, and he did not argue the provision to the jury.  Burton has therefore waived this argument.  *See Airfreight Exp. Ltd. v. Evergreen Ctr., Inc.*, 215 Ariz. 103, 109, ¶ 17 (App. 2007) (on a similar set of facts, holding "a party must timely present his legal theories to the trial court so as to give the trial court an opportunity to rule properly") (quoting *Payne v. Payne*, 12 Ariz. App. 434, 435 (1970)).  Accordingly, we decline to reverse the jury's verdict on the ground that the settlement agreement bars rescission due to fraud.

## II.     Burton Waived His Argument That the Trial Court Should Have Forced Erdmann to Elect a Remedy

¶19         Burton argues that the trial court improperly allowed Erdmann to proceed under two inconsistent theories, and as a result the jury was confused and returned inconsistent verdicts with damages for both breach of contract and rescission of the settlement agreement.  Election of remedies is characterized as an affirmative defense that is waived unless timely asserted.  *See Estate of Wesolowski v. Indus. Comm'n*, 192 Ariz. 326, 329, ¶ 10 (App. 1998).  Burton failed to raise this defense until this appeal.  Burton did not object to the final instructions given to the jury, the additional instructions given after the jury asked about damages, or the verdicts as being duplicative or incongruent after they were read.  These repeated failures to object waived this argument on appeal.[5]  *See Montano v. Scottsdale Baptist Hosp., Inc.*, 119 Ariz. 448, 453 (1978) (a party may not claim a jury instruction was in error on appeal if he or she did not object before the jury receives the instructions and retires to consider its verdict); *Trustmark Ins. Co. v. Bank One, Arizona, NA*, 202 Ariz. 535, 543, ¶ 38-39 (App. 2002) (a party must object when the verdict is rendered if it believes the jury was confused or the verdict was contrary to law, otherwise the party waives objection to error; furthermore, if a party believes the verdict is inconsistent, defective, or nonresponsive, it must move under Ariz. R. Civ. P. 49(c) for resubmission of the case to the jury); *see also* Ariz. R. Civ. P. 51(a) ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection").

---

[5]  In the final judgment, the trial court avoided duplicative damages by not awarding Erdmann damages against Burton for breaching the settlement agreement.

### III.     The Trial Court Did Not Err in Declining to Grant a New Trial Based on Failing to Address the Veil-Piercing Issue

¶20         We apply an abuse of discretion standard when reviewing a trial court's denial of a motion for new trial.  *Styles v. Ceranski*, 185 Ariz. 488, 450 (App. 1996).

¶21         Burton argues that the trial court should have ruled on whether to pierce the corporate veil.  He asserts that the court's failure to do so led to improper duplicate awards for Erdmann against both Burton and Burton Partners and to Lechner receiving more money than he requested.  The record does not support these assertions.

¶22         The record shows that both Burton and Burton Partners were instrumental in creating the debt on which Erdmann sued.  Burton was the original purchaser of Kebko and the original party to use Erdmann's lines of credit.  The extension agreement and settlement agreement were signed by "Kent Burton, Member and Individually" for Burton Partners.  Thus, it was not improper for the jury to conclude that both Burton and Burton Partners could be held responsible for the damages incurred.

¶23         As for Lechner's damages, Burton argues that the trial court's instructions to the jury did not address the veil-piercing issue and therefore led to the jury erroneously awarding Lechner double the amount he requested.  But Burton misstates the total amount requested by Lechner and does not account for each month of lost profits.  The jury awarded Lechner $25,793.10 against Zyrax for the down payment and the monthly payments to Erdmann on the House Hunters Note.  The jury also awarded Lechner $30,346.19 against Burton for the profits Lechner lost due to Burton's fraud.

¶24         The trial court did not abuse its discretion in denying Burton's motion for new trial regarding these issues.

### IV.     Burton Waived His Argument that the Economic Loss Doctrine Precluded Tort Claims Against Him

¶25         The ELD is a common law rule that limits contracting parties to their contractual remedies when damages are purely economic and there is no physical injury to persons or property.  *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 Ariz. 320, 323, ¶ 12 (2010).  Application of the ELD is a legal question that we review de novo.  *Id.*, 223 Ariz. at 322, ¶ 9.

¶26 Erdmann and Lechner assert that Burton waived his argument that the ELD bars relief on all tort claims. We agree. The general rule for waiver is that, absent exceptional circumstances, this court will not consider an argument raised for the first time on appeal. *See Englert v. Carondelet Health Network*, 199 Ariz. 21, 26, ¶ 13 (App. 2000); *see also Trantor v. Fredrikson*, 179 Ariz. 299, 300 (1994). The parties dispute whether the ELD is an affirmative defense, but that makes no difference. Burton did not raise the ELD at any point during the trial. We therefore conclude that Burton waived his argument that the ELD precluded the tort claims.

## V. The Award of Punitive Damages Was Not Error

¶27 We view the evidence in the light most favorable to upholding the jury verdict awarding punitive damages and we will affirm if any substantial evidence exists permitting reasonable jurors to reach such a result. *See Arellano v. Primerica Life Ins. Co., Co.*, 235 Ariz. 371, 378-79, ¶ 35 (App. 2014)

¶28 Burton argues that Erdmann and Lechner were not entitled to punitive damages for two reasons. First, Burton claims that punitive damages were not appropriate for either party because the evidence presented did not support a finding of "something more" than just the underlying tort. Second, Burton claims that Lechner failed to plead punitive damages and was therefore precluded from recovering them. Alternatively, Burton argues that the $96,000 punitive damages award to Erdmann was disproportionate to the conversion claim.

### A. Burton Waived His Argument Regarding Punitive Damages Sought by Lechner

¶29 Burton argues that Lechner was not entitled to punitive damages because he did not ask for them in his complaint or in the joint pretrial statement. But the jury instructions stated that "Lechner has requested an award of punitive damages" against Burton, and Burton did not object to the jury instructions on punitive damages. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Ariz. R. Civ. P. 15(b). Because Burton did not object to the instructions, the punitive damages are treated as if they had been raised in the pleadings. *See Montano*, 119 Ariz. at 453; *see also* Ariz. R. Civ. P. 51(a).

Therefore, the court did not err in allowing the jury to consider awarding punitive damages in favor of Lechner.

        B.       <u>The Evidence Permitted the Jury to Award Punitive Damages to Erdmann and Lechner</u>

**¶30**      A plaintiff may recover punitive damages by proving through clear and convincing evidence that the defendant "engaged in aggravated and outrageous conduct with an evil mind." *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 132 (App. 1995) (internal quotations omitted). An evil mind may be inferred through evidence that the defendant "continued his actions despite the inevitable or highly probable harm that would follow." *Gurule v. Illinois Mut. Life and Cas. Co.*, 152 Ariz. 600, 602 (1987). Evidence of subjective intent to injure is not required, only a "conscious disregard of a substantial risk of significant harm to others." *Warner v. Sw. Desert Images, LLC*, 218 Ariz. 121, 130 ¶ 24 (App. 2008).

**¶31**      The record shows multiple instances in which Burton acted in a way that created a substantial risk of harm to Erdmann and Lechner. Supporting the award to Lechner, Burton's misstatements regarding the financial status of House Hunters created a substantial risk that Lechner would be financially harmed by purchasing it. The jury heard evidence that Burton provided multiple false documents and statements to entice Lechner to buy a failing company.

**¶32**      In regard to the punitive damage award to Erdmann, Burton repeatedly failed to pay off the credit lines and vendor accounts for which Erdmann was liable. *See supra* ¶¶ 4–6. Burton cashed multiple checks that belonged to Erdmann without repaying him. Burton's knowledge of the potential infirmity of the House Hunters Note, coupled with his willingness to offer it to Erdmann in exchange for Erdmann's release of more substantial claims, demonstrated Burton's disregard for the risk of harm to Erdmann. Also, after Lechner began having financial difficulty, Burton told him he could cease payments to Erdmann. Furthermore, the record shows that Burton attempted to sell Kebko for nearly twice what he had bought it for and represented it as a profitable business with considerable gross income and cash flow, while at the same time failing to make payments on Erdmann's credit lines and accounts. Finally, before selling Kebko to a new buyer, Burton unilaterally removed the UCC lien so that Erdmann would have no claim to payment from the new buyer. *See supra* ¶ 11.

¶33 Fraud alone does not support punitive damages. *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 501 (1982). But based on the record in this case, the jury could have found by clear and convincing evidence that Burton's conduct was aggravated and outrageous, evincing an evil mind. Therefore, we decline to set aside the punitive damages awards.

C. The Amount of Punitive Damages Awarded Was Not Excessive

¶34 Because of constitutional concerns, the amount of punitive damages awarded is subjected to more rigorous appellate review. *Kline v. Kline*, 221 Ariz. 564, 572 ¶ 29 (App. 2009). We will uphold the awarding of punitive damages if "any reasonable view of the evidence would satisfy the clear and convincing standard." *Hyatt Regency*, 184 Ariz. at 132. And we will affirm the amount of punitive damages awarded "unless it is so unreasonable in light of the circumstances as to show passion or prejudice." *Rustin v. Cook*, 143 Ariz. 486, 491 (App. 1984).

¶35 Burton argues that Erdmann's punitive damage award of $93,235.50 is excessive because it was based solely on the conversion claim. However, the jury also found Burton had defrauded Erdmann, and returned a general verdict for $39,917.48 in compensatory damages based on all of Erdmann's claims, including negligent misrepresentation, fraud, interference with contract, conversion, and breach of contract. Burton did not object to the use of a general verdict, and the jury therefore did not separate the amount of damages attributable to the various claims. Because Burton did not object to the general verdict form for compensatory damages and because the special interrogatories reveal the jury found for Erdmann on fraud and conversion, we may presume for these purposes that the tort damages were determined by the jury to be $39,917.48. *See Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 341 (App. 1983) (a general verdict will be upheld if evidence on one count, issue or theory is sufficient to sustain the verdict."); *see also Mullin v. Brown*, 210 Ariz. 545, 551-52 ¶¶ 25-26 (App. 2005). An award of $93,235.50 in punitive damage, establishing a ratio of 2.3:1, is not excessive. *See Arellano*, 235 Ariz. at 380, ¶ 45 (permitting punitive damage ratio of 4:1).

**VI. Fee Requests**

¶36 Erdmann and Lechner both request attorney fees and costs on appeal. Erdmann cites Arizona Revised Statutes section 12-341.01 and paragraph 12 of the settlement agreement with Burton. Lechner requests

fees and costs "on the same basis" "as he did at the trial court level." In accordance with Arizona Rule of Civil Appellate Procedure (ARCAP) 21(a)(2), this court will exercise its discretion to award an amount of reasonable attorney fees and also taxable costs to Erdmann and Lechner upon their compliance with ARCAP 21.

**CONCLUSION**

¶37 Based on the foregoing, we conclude that the evidence supports the general verdict and the damages awarded. We further conclude that the trial court did not abuse its discretion in denying a new trial. We therefore affirm the judgment of the trial court.

